**Doletha TINSLEY, et al., Plaintiffs,**

v.

**Jack L. KEMP, et al., Defendants.**

**No. 89–0023–CV–W–1.**

United States District Court,
W.D. Missouri, W.D.

Jan. 3, 1990.

Julie Levin, Kelly P. Finn, Legal Aid of Western Missouri, Kansas City, Mo., for plaintiffs.

John L. Williams and Taylor Fields, Fields, Brown, Williams & Clark, Kansas City, Mo., Vernon Poschel, Asst. U.S. Atty., Kansas City, Mo., for defendants.

## ORDER

WHIPPLE, District Judge.

In this action, plaintiffs seek declaratory and injunctive relief in equity, but not damages. Five motions are pending:

1. Plaintiffs filed a motion on January 31, 1989, seeking an order determining that this matter should be maintained as a class action. Defendants Mike Fish-

er and Housing Authority of Kansas City filed a memorandum in opposition on April 17, 1989. Plaintiffs filed a reply on April 27, 1989. The motion will be granted, and a class will be certified to seek equitable relief.

2. Defendants United States Department of Housing and Urban Development and Jack L. Kemp, secretary of the department (hereinafter, those two defendants collectively are "HUD") filed a motion on May 23, 1989, to dismiss this action. Plaintiffs filed suggestions in opposition on June 28, 1989, and HUD filed a reply on July 27, 1989. Plaintiffs submitted supplemental suggestions in opposition on October 19, 1989. The motion will be granted in part and denied in part.

3. HUD filed, on October 30, 1989, a motion to strike plaintiffs' supplemental suggestions or, in the alternative, for leave to file a limited response. Plaintiffs filed suggestions in opposition to the motion on November 1, 1989. The motion will be denied in part, in that the supplemental suggestions will not be stricken. However, the motion will be granted in part in that HUD's limited response will be considered.

4. HUD filed a motion on August 8, 1989, to stay discovery pending a ruling on the motion to dismiss. Plaintiffs filed their opposition on August 29, 1989. HUD replied on September 8, 1989. The motion will be denied as moot.

5. Plaintiffs filed a motion on December 6, 1989, to compel production of documents. HUD filed opposition on December 21, 1989. The motion will be granted.

## I. STATEMENT OF THE CASE

Five plaintiffs are residents of T.B. Watkins Homes ("Watkins Homes"), a public housing project in Kansas City, Missouri. The sixth plaintiff is a homeless applicant who has been on a waiting list for public housing since April 1988.

Defendants Housing Authority of Kansas City, Missouri, and Michael Fisher, the authority's executive director (hereinafter, these two defendants collectively are "HAKC"), operate Watkins Homes. HAKC is a public housing authority which administers federally subsidized and assisted low-rent housing programs as authorized by the United States Housing Act of 1937 ("Housing Act"). HUD is a federal agency with statutory obligations, duties, and responsibilities under the Housing Act. HUD also is responsible for implementing and enforcing regulations promulgated to effectuate statutory responsibilities.

Plaintiffs allege essentially that defendants are permitting deterioration of residential units at the Watkins Homes which, in effect, is illegal demolition of the units. This passive sort of *de facto* demolition results in fewer units available to applicants, and a lower quality housing project for the residents, plaintiffs allege. Plaintiffs primarily seek declaratory judgment and an injunction to prevent the alleged *de facto* demolition. They seek no money damages.

Plaintiffs seek relief under a variety of theories. Their claims:

(1) Violation of 42 U.S.C. § 1983 by HAKC (constitutional rights claim),

(2) Violation of Housing Act provisions by HUD (implied cause of action under Section 18(d) of the Housing Act [42 U.S.C. § 1437p] and 24 C.F.R. Part 970),

(3) Commission of an administrative legal wrong by HUD for which there is redress under 5 U.S.C. § 702 (Administrative Procedures Act, or "APA", claim),

(4) Breach of contract by HUD and HAKC (third-party beneficiary claim),

(5) Discriminatory impact of violations of Housing Act by HAKC and HUD (Title VIII claim under Fair Housing Act of 1968 [42 U.S.C. § 3604(a) and 3608(d) ] ),

(6) Facially discriminatory impact of violations of Housing Act by HUD (another Title VIII claim), and

(7) Discrimination against intended beneficiaries by HAKC and HUD for failure to maintain decent housing (Title VI claim [42 U.S.C. § 2000d et seq.] ).

## II. FACTS [1]

As a public housing authority ("PHA"), HAKC has an annual contributions contract ("ACC") with HUD to receive subsidizing funds for operation and maintenance of low-income housing under the Housing Act. 42 U.S.C. §§ 1437c and 1437g. The PHA is subject to extensive regulation by HUD in numerous areas, including demolition and disposition of public housing units or projects. Procedures, limits and requirements for demolition and disposition are set in 42 U.S.C. § 1437p.

Watkins Homes had 348 residential units in 1983 when HAKC asked to demolish 48 units because of delay in making relatively simple repairs. Demolition would be less expensive than the rehabilitation cost of $4,500 per unit. HUD approved the demolition, reducing the number of units to 300. In 1984 HAKC asked to demolish 12 more units, due to poor maintenance and substandard conditions. With HUD's permission, the number of units dropped to 288.

In the summer of 1988, HUD assigned a staff member to be officed full-time at the HAKC central office to oversee and monitor HAKC's management and operation of public housing projects. HUD did not force HAKC to remedy defects and rehabilitate vacant units, and did not grant funds for rehabilitation at Watkins Homes.

Of the 288 remaining units, 118 are vacant. In May 1988, only 35 units were vacant. The vacant units are unsecured, uninhabitable, dilapidated, and open to trespassers, arsonists and drug dealers. The vermin-infested units are full of trash. Many units are stripped of window frames, appliances, cabinets and counter tops. The common areas have broken windows, and are full of trash, human waste, and broken glass.

Like 99% of Watkins Homes residents, all the plaintiffs are nonwhite. Five of the plaintiffs, as residents, suffer from their exposure to the deteriorated conditions of the vacant units. More than 170 persons reside in the occupied units at Watkins Homes.

The sixth plaintiff is one of the 1,050 persons waiting to enter public housing. More nonwhite persons than white persons are waiting. They are living in substandard and/or overcrowded conditions, are facing eviction for inability to pay rent, or are homeless. The sixth plaintiff is homeless and has four children. She has lived in various shelters, and currently is living with ten other persons in a three-bedroom house. She has applied for a unit at Watkins Homes.

Despite the alleged *de facto* demolition of the 118 vacant units, HAKC has not consulted with tenants regarding the future of Watkins Homes so it has not developed post-demolition plans after consultation with tenants. HAKC further has not provided adequate relocation assistance, and has not developed a relocation plan for displaced tenants.

## III. THE MOTIONS

### A. Class Action

#### 1. Arguments

■ Plaintiffs seek certification of a class action pursuant to Rule 23(b)(2), Fed. R.Civ.P. The class would include all residents of Watkins Homes, and all applicants who have been put on a waiting list for HAKC-operated public housing. They claim to have the four class characteristics required in Rule 23(a). They also contend the defendants acted on grounds generally applicable to the class, and that injunctive and declarative relief is appropriate, so a class should be certified under Rule 23(b)(2).

Defendant HAKC opposes certification on four grounds: (1) The relief, as a practical matter, would benefit proposed class members anyway, so certification is unnecessary. (2) The boundaries of the putative class have been defined inadequately. (3) Plaintiffs have not satisfied the characteristics required by Rule 23(a). (4) No sufficient nexus has been shown between the class and liability, i.e., the proposed class

---

1. For purposes of ruling these four motions, the facts set forth by plaintiffs will be accepted as

accurate—just as HUD accepted plaintiffs' facts in its May 23, 1989, motion to dismiss at page 8.

has not been limited to those harmed by defendants.

Plaintiffs replied that Rule 23(b)(2) specifically provides for class certification where injunctive and declaratory relief is sought. They raise four reasons why a class is necessary here. First, if a class is declared, plaintiffs argue, their claims could avoid premature mootness. (For instance, defendants merely could provide decent housing only for the named plaintiffs, thereby making their claims moot before the issues are resolved.) Thus the relief sought for other aggrieved parties could be obtained without litigating separately for each individual resident or applicant. Second, class status protects absent parties. Third, all class members subsequently can enforce relief. Finally, broader class issues can be considered in formulating class-wide relief. Plaintiffs further argue that the class definition is not too broad, that plaintiffs have standing, and that they have satisfied the Rule 23(a) requirements.

### 2. Discussion

Under Rule 23(a), parties may be representatives to sue or be sued of behalf of a class if:

(1) [T]he class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Under Rule 23(b)(2), a class action may be maintained if the requirements listed above are met and if:

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate relief or corresponding declaratory relief with respect to the class as a whole;

\*     \*     \*     \*     \*     \*

#### a. *Rule 23(a) Qualifications*

##### (1). Numerosity

The number of persons in the proposed class exceeds 1,220, demonstrating that as a practical matter individual lawsuits would be so burdensome on the parties (and the courts) that they could not be litigated otherwise. Individual litigation is even less likely when one considers that the putative class members are, by definition, low-income persons who could not afford to prosecute their own actions. Although the number of persons is small enough that they could be identified with particularity, the number still is too large to permit litigation merely by joining all the parties. The fluid nature of the class—with residents arriving and leaving—makes this group of plaintiffs particularly suitable for class certification. Although defendants argue to the contrary, any given individual easily can be identified with precision as being within or outside the class merely by looking at a list of residents and a list of applicants. The definition is not too vague, but the number is too large to accommodate by joinder.

##### (2). Commonality

The same single source of harm alleged by the plaintiffs is alleged to have occurred to all class members. The same alleged rights, allegedly protected by and enforceable under the same laws, would apply to plaintiffs and proposed class members alike. The remedy would apply to all class members the same as it would apply to the named plaintiffs. Contrary to HAKC's argument, the plaintiffs and proposed class members share more than a few characteristics. The few factual differences among individual persons are too insignificant, relative to what the persons allegedly have in common, to defeat certification. The common questions of law and fact are significant, substantial and obvious.

##### (3). Typicality

Likewise, the named plaintiffs' grievances are typical of those of the potential class members. The deteriorating conditions—resulting from the same action (and inaction) of defendants—of which resident plaintiffs complain are the same as the conditions allegedly causing *de facto* demolition that reduces the amount of housing for the plaintiff applicant. The factual proof and legal theories to be applied by

the named plaintiffs are precisely the same as would be used by the potential class members. The relief which the named plaintiffs seek is precisely the same which would relieve the alleged harm to the other potential class members.

The named plaintiffs quite clearly have a personal stake in the outcome. Their standing to sue, and to represent the proposed class, is manifest. A judgment in their favor clearly would benefit the proposed class members.

### (4). Representation Adequacy

As discussed above, the named plaintiffs have interests which are common to those of the potential class members. The plaintiffs' pleadings and supporting documentation demonstrate that they would prosecute the matter vigorously, with the assistance of qualified counsel. Defendants have raised no reason to doubt either of these propositions, and the court is aware of none. There is no reason to believe the named plaintiffs and any potential class members would have any conflict of interest. The named plaintiffs appear ready, willing and able to represent the other class members fairly, adequately and vigorously.

### b. *Rule 23(b)(2) Requirements*

Under 23(b)(2) the proposed class first must satisfy the requirements of Rule 23(a) which, as discussed above, have been met in this instance. Second, the opposing party must have acted or refused to act on grounds generally applicable to a class, thereby making final injunctive relief and corresponding declaratory relief appropriate.

As discussed above, the actions (or inaction) attributed to the defendants are the same with regard to all plaintiffs and potential class members. The most appropriate remedy under the circumstances would be injunctive and declaratory relief. That is precisely what the named plaintiffs seek, which would benefit all members of the potential class.

Curiously, HAKC argues that no class certification is necessary, inasmuch as any relief automatically would apply as a practical matter to all potential class members.

This argument must fail for two reasons. First, Rule 23(b)(2) specifically provides for certifying a class in instances such as this. Second, the experience in a similar case illustrates how invalid this argument is.

In *Todd v. Housing Authority of Kansas City*, No. 84–0852–CV–W–1 (W.D.Mo. Dec. 14, 1984), HAKC was a defendant which had stipulated to maintenance of the class action by a group of persons virtually identical to those which would be in the class here. Three years after a consent decree had been entered on December 14, 1984, class members had to return to the court for enforcement and modification of the decree to assure compliance. Without certification in that case, the named plaintiffs there would have had no standing, and there would have been no class members to seek enforcement. In other words, the resolution would not—as a practical matter—necessarily benefit all of the class if it had not been certified. The virtually complete identity of parties in that case, compared to this one, is too obvious for HAKC's argument to have any credence.

### 3. Conclusion

The requirements under Rule 23(a) clearly have been met. The appropriateness of injunctive and declaratory relief, if any, demonstrates that a class should be certified under Rule 23(b)(2). The nature of the class suggests that notice of certification should be a relatively simple task. The residents of Watkins Homes, obviously, are to be found in a relatively small geographic area. The applicants, by definition, have their names on a waiting list which presumably shows how they can be located.

A reasonable timetable for notification must be established. To promote efficiency, by reducing paperwork and this court's involvement, the parties will be directed to cooperate in developing a notification procedure for approval by the court. The procedure would include the text of a notice, the means of distributing it, the mechanism for "opting out," and the financing for the notice. The parties will be expected to act in good faith to develop stipulations

concerning the notice procedure to be submitted for approval.

### B. Dismissal

The federal defendants ("HUD") rely upon numerous points in support of their motion to dismiss the claims:

1. Plaintiffs failed to state a claim under Section 18(d) of the Housing Act (42 U.S.C. § 1437p) because

a. No actual demolition has occurred.

b. Section 18(d) does not express or imply a private right of action.

c. Any action by HUD is not subject to judicial review, because under the Administrative Procedures Act (5 U.S.C. § 701–706)

(1). Such action, if any, was discretionary, (5 U.S.C. § 701(a)(2)) and

(2). An adequate remedy is available against HAKC alone (5 U.S.C. § 704).

2. Plaintiffs failed to state viable civil rights claims under Title VI (42 U.S.C. § 2000d) and Title VIII (42 U.S.C. §§ 3604(a) and 3608(d)) because

a. Sovereign immunity was not waived.

b. No prima facie violations were pleaded against HAKC, so HUD's alleged failure to enforce against HAKC has not been pleaded.

c. Titles VI and VIII neither express nor imply a private right of action.

d. Plaintiffs do not allege civil rights violations by HUD under

(1). Title VI, or

(2). Title VIII, Section 804(a), or

(3). Title VIII, Section 808(e)(5).

3. Plaintiffs failed to state a contract claim because

a. They are not third-party beneficiaries.

b. They have not identified a breach of contract by HUD.

The arguments will be examined individually.

### 1. Section 18(d) of Housing Act

#### a. Decision to Demolish

█ HUD argues that, in the absence of an affirmative decision to cause actual demolition, no claim is stated under Section 18(d) of the Housing Act (42 U.S.C. § 1437p). This argument misses the point of plaintiffs' complaint. Plaintiffs allege that a *de facto* demolition has occurred by defendants' inaction. This is simply an allegation that, by inaction, defendants have accomplished what they cannot do by action.

Rather than alleging a conscious decision to demolish actively, the complaint essentially alleges that HUD passively decided not to decide to maintain the housing units. Plaintiffs allege this "non-decision" effectively left the units to deteriorate until overt demolition was the only available option. Plaintiffs should have the opportunity to prove that defendants accomplished, by inaction, what they were prohibited from doing actively.

This concept of "demolition by neglect" has been applied previously. In *Concerned Tenants Ass'n of Father Panik Village v. Pierce*, 685 F.Supp. 316, 321 (D.Conn.1988), the court said:

* * * By enacting § 1437p, Congress intended to prohibit the destruction of public housing projects without HUD approval. Because the result—the unapproved destruction of a housing project— is the same whether done by a wrecking ball and bulldozers or by neglect that renders the units uninhabitable, the requirements of § 1437p should apply to both actual and *de facto* demolitions. To conclude otherwise would allow public housing agencies to evade the law by simply allowing housing projects to fall into decay and disrepair.

\*　　\*　　\*　　\*　　\*　　\*

The use of the words "any action" and "any step" [in 42 U.S.C. § 1437p] can only be reasonably construed to encompass conduct, including an omission or failure to act, by a public housing agency that would result in the destruction of all or part of a housing project in the sense that the housing units would no longer be habitable. As reflected in the amendment [in 1987], Congress intended to ensure that tenants could fully enforce compliance with the physical condition requirements of § 1437p. To limit these

requirements to actual demolitions would undermine this intent.

HUD distinguishes *Concerned Tenants* by saying it applies only to neglect by the public housing agency (in this case, HAKC) rather than to neglect by HUD. However, HUD has the authority (and, plaintiff contends, the duty) to enforce housing regulations which would prevent such demolition by negligence. As in *Concerned Tenants*, plaintiffs have stated a claim sufficiently here to overcome a motion to dismiss.

### b. *Private Right of Action*

■ HUD contends that no private right of action exists under Housing Act Section 18(d) (42 U.S.C. § 1437p, which regulates demolitions) in favor of plaintiffs. Plaintiffs respond that other courts have found implied rights of action to enforce a closely related subsection, 42 U.S.C. § 1437a (which regulates rent charges).

In *Howard v. Pierce*, 738 F.2d 722, 725 (6th Cir.1984), the court found that low-income tenants clearly were the intended beneficiaries and thus privately could enforce regulations limiting rent amounts. In *Castleman v. HUD*, No. 83–0461–CV–W–8, 1988 WL 220583 (W.D.Mo. Sept. 8, 1988), the Honorable Joseph E. Stevens Jr. found an implied right of action to enforce rights to limited rent amounts in the public housing program. In *Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.*, 620 F.Supp. 806, 809 (S.D.N.Y.1985), *recon'd on other grounds*, 668 F.Supp. 187 (S.D.N.Y.1987), the courts also found low-income tenants could sue to enforce rights through private litigation. Likewise, the Supreme Court has found rights enforceable (through 42 U.S.C. § 1983) against public housing authorities in 42 U.S.C. § 1437a. *Wright v. Roanoke Redev. & Hous. Auth.*, 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987).

The section in question here, Section 1437p, is so closely related to Section 1437a that these cases could be considered dispositive. After all, if the intended primary beneficiaries—low-income tenants—can enforce restrictions on rent, they should be able to enforce restrictions on demolition. Nevertheless, in an abundance of caution,

the test promulgated in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975) will be applied to determine whether a private right of action can be inferred from Section 1437p. The four-part *Cort* test is: (1) Does the statute create a federal right in favor of plaintiff? (2) Does the legislative intent, explicitly or implicitly, create a private remedy or deny one? (3) Is it consistent with the purpose of the statute to imply such a remedy for plaintiff? (4) Is the cause of action one relegated to the sovereign states, such that inferring a right of action based solely on federal law would be inappropriate?

First, as noted in *Concerned Tenants*, *supra*, 685 F.Supp. at 320, the creation of a right is clear. The court in that case discussed *Edwards v. District of Columbia*, 821 F.2d 651 (D.C.Cir.1987), where Section 1437p was found not to have created an enforceable right that might be violated by a *de facto* demolition. The Congress promptly amended Section 1437p, and the court in *Concerned Tenants* quoted H.R. Conf.Rep. No. 426, 100th Cong., 1st Sess. (1987), U.S.Code Cong. & Admin.News 1987 pp. 3317, 3458:

> * * * This provision is intended to correct an erroneous interpretation of the existing statute by the United States Court of Appeals for the D.C. Circuit in *Edwards v. District of Columbia* and shall be fully enforceable by tenants of and applicants for the housing that is threatened.

Second, the Congressional disagreement with the *Edwards* court, and the reference to enforceability, manifest intent to create a private right of action. Third, the purpose of the statute obviously is to benefit low-income tenants, so permitting a private right to enforce is consistent with the purpose of the statute. *See Wright v. Roanoke Redev. & Housing Auth.*, *supra*, 479 U.S. at 430, 107 S.Ct. at 773; *See also*, *Cannon v. University of Chicago*, 441 U.S. 677, 703, 99 S.Ct. 1946, 1961, 60 L.Ed.2d 560 (1979). Finally, the entire scheme of the Housing Act, including promulgation, enforcement and funding, is and has been a matter for the federal government. It is

not traditionally a matter for state governments, so inferring a federal cause of action would not be inappropriate.

Courts have found a private right of action under Section 1437a, and the court in *Concerned Tenants, supra,* found an implied right of action under Section 1437p. Independently, this court also finds a private right of action under Section 1437p by applying the *Cort* test. Plaintiffs' complaint withstands the motion to dismiss on this point.

### c. *Judicial Review Despite the APA*

#### (1). Discretionary Act—5 U.S.C. § 701(a)(2)

█ HUD relies upon *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) in contending that the Administrative Procedures Act, under 5 U.S.C. § 701(a)(2), presumes immunity from judicial review of a decision *not* to enforce regulations. Plaintiffs respond that, under *Traynor v. Turnage,* 485 U.S. 535, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988), there is a strong presumption that Congress intends judicial review of administrative action. A comparison of the related case law reveals that these two cases are not necessarily in conflict. Rather, as noted by plaintiffs and in the *Chaney* case itself, the presumed immunity is a narrow exception to the overall presumption favoring judicial enforcement. *See, Heckler v. Chaney, supra,* 470 U.S. at 826, 830, and 838, 105 S.Ct. at 1652, 1655, and 1659; *Dunlop v. Bachowski,* 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Indeed, the APA itself provides, in part, "[a] person ... adversely affected or aggrieved by agency action ... is entitled to judicial review thereof."

*Chaney* is a peculiar case wherein the federal Food and Drug Administration was challenged by Oklahoma and Texas deathrow inmates. They argued that the drug used for lethal injections had not been approved by the FDA as "safe and effective" for human executions. The court would not permit judicial review of FDA's refusal to enforce drug laws, analogizing FDA's position to the doctrine of prosecutorial immunity. *Chaney, supra,* 470 U.S. at 827 and 834, 105 S.Ct. at 1653 and 1657. The court reiterated, in its closing paragraph, that the exemption from judicial review is a narrow one which is used only where Congress intended an agency action to exempt from such review. *Chaney, supra,* 470 U.S. at 838, 105 S.Ct. at 1659.

As noted above, a private right of action clearly was intended by the Congress. Such a right, by definition, is a right to obtain judicial review. Contrary to HUD's position, this matter is not within the narrow exemption from judicial review. Rather, it is within the general rule that agency action should be subject to judicial review. The same finding was made by Judge Stevens in *Castleman v. HUD,* No. 83–0461–CV–W–8 (W.D.Mo. Sept. 8, 1988) in regard to the closely related subsection, 42 U.S.C. § 1437a.

#### (2). Remedy Against HAKC—5 U.S.C. § 704

█ HUD argues that an adequate remedy is available in an action against HAKC alone so, under 5 U.S.C. § 704, review of HUD's actions is barred. Plaintiffs respond that any remedy fashioned against HAKC alone would be ineffective without a judgment against HUD. The court agrees.

The pervasive regulation, the frequent and close oversight, and the funding provided by HUD to HAKC illustrates that HAKC could not correct alleged problems to any significant degree without HUD cooperation, supervision, approval and funding. A remedy directed only at HAKC could be nearly worthless in these circumstances. Any meaningful remedy could be achieved only with HUD's involvement, so Section 704 does not preclude judicial review here.

### 2. Civil Rights Claims

#### a. *Sovereign Immunity*

█ HUD argues that sovereign immunity bars the claims under Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d) and Title VIII of the Fair Housing Act of 1968 (42 U.S.C. §§ 3604(a) and 3608(d)). However, HUD also acknowledges in its

motion and reply to plaintiffs' response that the civil rights claims could be brought under 5 U.S.C. § 702, which provides, in pertinent part:

> * * * An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein denied on the ground that it is against the United States.... * * *

HUD's acknowledgement is consistent with several cases. *See Young v. Pierce,* 628 F.Supp. 1037, 1058 (E.D.Tex.1985), *vacated on other grounds,* 822 F.2d 1368 (5th Cir. 1987); *Larson v. Domestic and Foreign Commerce Corp.,* 337 U.S. 682, 690–691, 69 S.Ct. 1457, 1461–1462, 93 L.Ed. 1628 (1949); *See also, Dugan v. Rank,* 372 U.S. 609, 621–622, 83 S.Ct. 999, 1006–1007, 10 L.Ed.2d 15 (1963); *Gautreaux v. Romney,* 448 F.2d 731, 735 (7th Cir.1971); *United States v. Yonkers Board of Ed.,* 594 F.Supp. 466, 469 (S.D.N.Y.1984).

Plaintiffs oppose the motion to dismiss on sovereign immunity grounds. However, they ask in the alternative for leave to amend their complaint to insert the reference to Section 702 so they can maintain their civil rights claims. Rule 15, Fed.R. Civ.P., provides that leave to amend will be granted freely when justice requires. The intent of the complaint is obvious, so the amendment would be almost a formality. Nevertheless, plaintiffs' basis for bringing civil rights claims against a federal agency should be established explicitly in their complaint. Accordingly, leave will be granted to amend the complaint.

#### b. *Prima Facie Case Against HAKC*

HUD contends that plaintiffs failed to allege a prima facie case of civil rights violations by HAKC and, therefore, HUD cannot be held liable for any such violations. Plaintiffs respond that they have shown discriminatory effects and, thus, have alleged a prima facie case under each of Title VIII of the Federal Housing Act (42 U.S.C. § 3604) and Title VI of the Civil Rights Act (42 U.S.C. § 2000d).

#### (1). Title VIII Claim

▮▮▮ HUD contends that its liability under Title VIII would be due to its failure to enforce regulations against HAKC when it was violating Title VIII. That liability would presuppose that HAKC was violating Title VIII, but no such violation has been alleged by plaintiffs, HUD argues.

Plaintiffs respond that 99% of the residents at Watkins Homes are members of a racial minority, and most of the homeless or inadequately housed persons are minority members. They further respond that the alleged *de facto* demolition effectively reduces the quality and number of housing units for disproportionately more minority persons than non-minority persons.

The case law supports plaintiffs' position. The prima facie Title VIII claim was discussed in the relatively recent case of *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 934 (2nd Cir.), *aff'd* 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 *reh. denied,* 488 U.S. 1023, 109 S.Ct. 824, 102 L.Ed.2d 813 (1988). In that case, the court compared the Title VIII standard to the standard for Title VII (employment discrimination) and relied in part on two cases from the Eighth Circuit Court of Appeals. The court said:

> The prima facie standard for Title VIII disparate impact cases involving public defendants is a question of first impression in this circuit. In *Boyd v. Lefrak Org.,* 509 F.2d 1110 (2d Cir.), *rehearing denied,* 517 F.2d 918 (2d Cir.), *cert. denied,* 423 U.S. 896, 96 S.Ct. 197, 46 L.Ed.2d 129 (1975), a divided panel, considering a Title VIII case against a private defendant, doubted the relevance of the methodology used in Title VII litigation. 509 F.2d at 1114. Since then, however, we have pointedly accepted the relevance of Title VII cases to Title VIII cases. *See United States v. Starrett City Assoc.,* 840 F.2d 1096, 1101 (2d Cir. 1988); *Robinson* [*v. 12 Lofts Realty, Inc.*], 610 F.2d [1032] at 1036–37 [(2nd Cir.1979)]. Thus, even if the views expressed in *Lefrak* still apply in a Title VIII case against a private defendant, a matter of considerable uncertainty, the

disparate impact approach of Title VII cases is fully applicable to this Title VIII case brought against a public defendant.

Under disparate impact analysis, as other circuits have recognized, a prima facie case is established by showing that the challenged practice of the defendant "actually or predictably results in racial discrimination; in other words that it has a discriminatory effect." *United States v. City of Black Jack,* 508 F.2d 1179, 1184–85 (8th Cir.1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975). The plaintiff need not show that the decision complained of was made with discriminatory intent. *United States v. Yonkers Board of Education,* [*supra*], 837 F.2d 1181, 1217 (2d Cir. 1987); *Robinson,* 610 F.2d at 1036–38; *Resident Advisory Board v. Rizzo,* 564 F.2d 126, 146–48 (3d Cir.1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978); *Smith v. Anchor Bldg. Corp,* 536 F.2d 231, 233 (8th Cir. 1976); *Black Jack,* [*supra*], 508 F.2d at 1184–85. Refusal to require intent in disparate impact cases is entirely consistent with our prior decisions. *See Starrett City,* [*supra*], 840 F.2d 1100; *Yonkers,* 837 F.2d at 1217; *Robinson,* 610 F.2d at 1036–38. In determining whether discriminatory effect is sufficient, we look to congressional purpose, as gleaned from the legislative history of Title VIII, related Title VII jurisprudence, and practical concerns. Although none of these considerations is alone determinative, taken together they strongly suggest that discriminatory impact alone violates Title VIII.

HUD incorrectly would limit the field for testing alleged discrimination to only those persons who reside at Watkins Homes. HUD relies upon *Betsey v. Turtle Creek Associates,* 736 F.2d 983 (4th Cir.1984). That case concerned disparate treatment of minority tenants as compared to non-minority tenants within a particular building of an apartment complex. The court, at 987, looked to whether there was a disproportionate impact on minority members (as compared to non-minority members) within the limited group to which the defendant's policy applied.

In the present case, the allegation of discrimination is broader, and should be applied to a broader range of persons. The allegation is that, among low-income persons who have or seek subsidized housing, the alleged *de facto* demolition at Watkins Homes has a disproportionate and discriminatory impact upon persons who belong to minorities than upon non-minority persons. The comparison concerns all low-income persons who have or seek subsidized housing operated and administered by HUD. Such low-income persons are not all members of minorities, although nearly all (99%) persons living at Watkins Homes are members of minorities. Therefore, actions affecting residents or applicants at Watkins Homes are more likely to affect members of minorities than would actions affecting all low-income persons. The allegation of disparate impact is sufficient to withstand a motion to dismiss.

### (2). Title VI Claim

In the Eighth Circuit, the disparate-impact analysis does not apply to claims under Title VI of the Civil Rights Act of 1964. Intent to discriminate is required under Title VI, rather than mere proof of disparate impact or effects. In *Williams v. City of Sioux Falls,* 846 F.2d 509, 511 (8th Cir.1988), the court said:

> The district court correctly recognized that under plaintiff's individual claim, each theory of recovery is viable only if the City intentionally treated the plaintiff less favorably because of his race. *See Guardians Ass'n v. Civil Serv. Comm'n,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The court employed the traditional analysis utilized to decide questions of intentional discrimination, asking first whether the plaintiff had established a prima facie case.

\*　　\*　　\*　　\*　　\*　　\*

Absent an allegation of intentional discrimination, the claim under Title VI must be dismissed.

#### c. Private Actions Under Titles VI and VIII

■ Inasmuch as no viable Title VI claim has been alleged by plaintiffs, there is no need to reach the issue of whether a private action may be brought against HUD under Title VI. The claim under Title VIII is another matter, however. Immediately after a lengthy discussion of a private right of action under Title VI, the court in *Clients' Council v. Pierce,* 711 F.2d 1406, 1424–1425 (8th Cir.1983), examined the Title VIII claim. The court found that HUD "failed to carry out its affirmative duty to 'institute action the direct result of which was to be the implementation of the dual and mutual goals for fair housing and the elimination of discrimination in that housing.'" 711 F.2d at 1425, quoting in part *Banks v. Perk,* 341 F.Supp. 1175, 1182 (N.D.Ohio 1972), *aff'd in part, rev'd in part on other grounds,* 473 F.2d 910 (6th Cir.1973). The only fair reading of the discussion is that a private right of action against HUD is implied in Title VIII.

#### d. Civil Rights Violations by HUD

■ HUD contends that plaintiffs have failed to allege civil rights violations by HUD under Title VI; Title VIII, Section 804(a); or Title VIII, Section 808(e)(5). As stated above, plaintiffs have failed to alleged the intentional discrimination necessary for a Title VI violation. HUD's position regarding Sections 804(a) and 808(e)(5) of Title VIII (42 U.S.C. §§ 3604(a) and 3608(d)) relies upon its characterization of plaintiffs' claims as "nonenforcement" claims. The complaint reveals, however, that the claims are allegations of actual overt and direct involvement by HUD in the passive decision-making process to permit alleged *de facto* demolition to occur. The allegations of discriminatory activity by HUD bring the claims within the requirements of the cases cited by HUD. Therefore, the claims against HUD under Title VIII, Section 804(a); or Title VIII, Section 808(e)(5) (42 U.S.C. §§ 3604(a) and 3608(d)) need not be dismissed for failure to allege discriminatory activity by HUD.

### 3. Contract Claim

#### a. Third–Party Beneficiary

■ HUD argues that the plaintiffs were not the intended beneficiaries of the annual contributions contract ("ACC") between HUD and HAKC. Therefore, HUD contends, plaintiffs cannot bring claims under the ACC as third-party beneficiaries. The case law is contrary.

In *Ashton v. Pierce,* 716 F.2d 56, *modified,* 723 F.2d 70 (D.C.Cir.1983), public housing tenants were found to be third-party beneficiaries of the ACC and had the right to enforce the duties arising under it. Likewise, third-party enforcement rights were found under the ACC in *Concerned Tenants of Father Panik Village v. Pierce, supra,* 685 F.Supp. at 324.

In *Holbrook v. Pitt,* 643 F.2d 1261, 1270 (7th Cir.1981), public housing tenants were found to be third-party beneficiaries to a "HAP" contract. A "HAP" contract provides for housing assistance payments by HUD to landlords to maintain low rent levels pursuant to Section 8 of the Housing Act (42 U.S.C. § 1437f). *See also, Knox Hill Tenant Council v. Washington,* 448 F.2d 1045 (D.C.Cir.1971); *Free v. Landrieu,* 666 F.2d 698, 700, 702 (1st Cir.1981).

#### b. Breach of Contract

■ HUD asserts that plaintiffs have failed to allege a breach of contract to support their claim. The purpose of the ACC is to provide safe, decent, sanitary and affordable housing for eligible low-income people. *See Concerned Tenants of Father Panik Village v. Pierce, supra,* 685 F.Supp. at 323; *Ashton v. Pierce, supra,* 716 F.2d at 66; *Holbrook v. Pitt,* 643 F.2d at 1271–1272. The agreement authorizes payment of funds to a housing authority on the condition that it complies with federal housing laws. *See,* 42 U.S.C. § 1437c, 42 U.S.C. § 1437g, and 24 C.F.R. § 941.103. In this instance, plaintiffs clearly have alleged failure to comply with the contract requirements. A breach has been sufficiently alleged to evade dismissal.

### C. Strike Supplemental Suggestions

In the motion filed October 30, 1989, HUD objects to plaintiffs' supplementary suggestions, which were filed on October 19, 1989. The supplementary suggestions called to the court's attention a recent decision from a district court in Ohio on a related matter. HUD's argument was that plaintiffs had no permission to file the additional pleading, and so it should not be considered. Alternatively, HUD requested that its response to the supplementary suggestions be considered. For the sake of clarity in the record, plaintiffs will be granted leave *nunc pro tunc* to file supplementary suggestions. Further, HUD's motion to strike the suggestions will be denied, but the alternative request for consideration of the response to the supplementation will be granted.

### D. Stay Discovery

HUD filed a motion to stay discovery pending a ruling on the motion to dismiss. The motion would appear to be moot, if based entirely upon the need to await a ruling on the motion. Of course, the pendency of a dispositive motion is not, by itself, sufficient to stay discovery. See Local Rule 15 D.

### E. Compel Production

▉ Plaintiffs filed a motion on December 6, 1989, to compel production of documents. HUD filed opposing suggestions, relying upon the fact that a motion to dismiss and a motion to stay discovery were pending. Attached to the motion is a document which is purported to be a letter dated November 6, 1989, from counsel for HUD. The text of the purported letter:

> Perhaps I am obtuse, but I do not believe that Local Rule 15D applies to require completion of discovery pending a motion to stay that same discovery. Otherwise, the one would moot one's own motion, don't you think? We will await ruling on our motion or on any motion to compel you find it necessary to file.

The purported letter's observation suggests two interesting concepts. First, it implies that a motion to stay discovery is not a motion within the meaning of Local Rule 15 D.[2] The rule does not exempt particular types of motions. Second, the author is apparently so concerned about making the motion moot, that the inescapable consequence is overlooked. That is, by refusing to comply with discovery merely because a motion to stay is pending, a party effectively is granting its own motion to stay—even before the court has ruled. Such a phenomenon would reduce a court's orders to useless and senseless formalities. The parties may be assured that this court's orders are not intended to be viewed or received so cavalierly.

The attitude conveyed in the letter also appeared in the opposition to the motion, although HUD did concede that a dispositive motion does not automatically stay discovery under Local Rule 15. HUD's sole (albeit misguided) reason for refusing production is the pendency of a motion to stay discovery. Therefore, HUD should be free to produce the discoverable materials, now that the motion to stay has been denied. Denial of the motion to stay ordinarily would have permitted summary disposition of the motion to compel, but the circumstances suggested that some guidance on the local rules, especially concerning discovery, would be helpful to the parties.

### IV. CONCLUSION

As discussed above, plaintiffs will be permitted to represent a certified class. The parties will develop a proposed plan for managing the class action, including the notification mechanism, to be submitted for court approval.

The motion to dismiss will be denied, with two exceptions. First, a ruling on dismissal on the basis of sovereign immunity will be deferred, pending a motion by plaintiffs to file an amended complaint which would invoke jurisdiction under 5 U.S.C. § 702. Second, the claims against

---

2. Local Rule 15 ·D: **D. Filing of Motions Does Not Automatically Stay Discovery.** Absent an order of the Court to the contrary, the filing of *a motion*, including a discovery motion, a motion

for summary judgment, or a motion to dismiss, does not excuse counsel from complying with this rule and any scheduling order entered in the case. (emphasis added)

HAKC and HUD pursuant to Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d) will be dismissed for failure to allege intentional discrimination.[3]

HUD's motion to strike plaintiffs' supplemental suggestions will be denied in that the suggestions will not be stricken, but granted in that HUD's response will be considered. Plaintiffs' supplemental suggestions will be considered upon leave granted *nunc pro tunc* to file them. The motion to stay discovery will be denied. The motion to compel production will be granted. If the parties believe revision of the discovery schedule would be helpful, they may choose to submit jointly a proposed amended scheduling order.

It is

ORDERED that plaintiffs' motion, filed January 31, 1989, seeking an order determining that this matter should be maintained as a class action is granted. It is further

ORDERED that the proposed class is certified, pursuant to Rule 23(b)(2), Fed.R. Civ.P., such that the named plaintiffs may proceed on behalf of the class to seek *injunctive* and *declaratory* relief, and costs (but not monetary damages). It is further

ORDERED that the parties shall, within 30 days, jointly submit a proposed plan for notification of class members and for management of this class action, including any stipulations which would promote efficient management, for court approval. It is further

ORDERED that defendants' motion, filed May 23, 1989, to dismiss the complaint is granted in part and is denied in part. It is further

ORDERED that Count VII (i.e., plaintiffs' claims under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d) is dismissed as to all defendants. It is further

ORDERED that defendants' motion, filed October 30, 1989, to strike plaintiffs'

supplemental suggestions is denied in part and granted in part. It is further

ORDERED that plaintiffs are granted leave, *nunc pro tunc*, to file their supplemental suggestions, and the record shall continue to show it was filed October 19, 1989. It is further

ORDERED that defendants' motion, filed August 8, 1989, to stay discovery, is denied as moot. It is further

ORDERED that plaintiffs' motion, filed December 6, 1989, to compel production of documents requested in plaintiffs' first request for production of documents, is granted. It is further

ORDERED that the federal defendants shall respond within 30 days of the date of this order to the plaintiffs' first request, which was served on defendants on July 6, 1989, for production of documents. It is further

ORDERED that plaintiffs submit within 30 days a bill of reasonable expenses, including attorneys' fees, incurred by plaintiffs in filing their motion to compel, which plaintiffs would hope to recover from defendants.

---

**3.** Plaintiffs are requested to acknowledge the dismissal of Title VI claims when plaintiffs file their motion to amend their complaint, and in any proposed order they submit. Such acknowledgement in the motion and order would avoid additional motion practice on that point, while preserving the issue for appeal.